**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

FELIX A. MADRID,

        Plaintiff,

v.                                          No. CIV 05-312 LFG

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Felix A. Madrid ("Madrid") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Madrid was not eligible for disability insurance benefits ("DIB") or social security benefits ("SSI"). Madrid moves this Court for an order reversing the Commissioner's final decision or remanding for a rehearing. [Doc. No. 11.]

## Background

Madrid was born on September 4, 1952[1] [RP 38] and was 51 years old when the administrative law hearing was held. [RP 15.] He has an 11th grade education and never took the G.E.D. exam. [RP 15.] He is separated from his wife who lives in Denver, Colorado. He has five

---

[1]Some of the medical records indicate a birthdate of 9/4/54 rather than 9/4/52, but it appears that Madrid was born in 1952. [*See, e.g.,* RP 151.]

children, ages 18-22.  [RP 190.]  Madrid lives alone in Mora, New Mexico.[2]  [RP 15, 191.]  He has not worked since February 2003 and was receiving general assistance and food stamps.  [RP 191.]

On February 20, 2003, Madrid filed applications for DIB and SSI benefits, alleging he was unable to work as of February 8, 2003, due to back and feet pain.[3]  [RP 38, 178.]  His past relevant work was as a roofer, cook and maintenance worker.  [RP 15.]  Madrid worked as a roofer for about 25 years.  [RP 16.]

Madrid's applications for benefits were denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ").  An administrative hearing was held in Santa Fe, on August 6, 2004, during which Madrid was represented by counsel.  [RP 14, 187.]  In a decision, dated November 18, 2004, ALJ William Nail found that Madrid retained the capacity to perform light work activities, but was unable to perform his past relevant work.  [RP 17.]  At step five of the five-step sequential evaluation process, the ALJ concluded that Madrid was not disabled in accordance with the Medical -Vocational (Grid) Rule 202.10.  [RP 17, 18.]  Thus, Madrid was denied benefits.  He challenged this determination to the Appeals Council which denied his request for review on January 27, 2005.  [RP 5.]  This appeal followed.

The Court notes that on December 29, 2004, Madrid filed another application for benefits, while the February 20, 2003 applications were still pending before the Appeals Council.  The December 29, 2004 application alleged that Madrid was disabled based on the following impairments: "poorly controlled insulin dependent diabetes mellitus with peripheral neuropathy with chronic foot

---

[2]Mora is a small town located in rural northeastern New Mexico.  Its population is a little above 5,000 people, and it has never prospered economically.  Healthcare is limited within the town itself.

[3]Throughout a good portion of the early proceedings, Madrid appears to have been acting *pro se*. Madrid's attorney provided a letter in the record noting that he had been retained by Madrid in early 2004.  [RP 9.]

and leg pain, renal failure, Hepatitis C with abnormal liver function, alcohol abuse, a history of substance abuse, a mood disorder secondary to chronic medical condition with depressive features, an irregular heart beat, and degenerative disc disease of the lumbar spine with chronic back pain." [Doc. No. 14, 2005, Ex. A-4, p. 3 (ALJ decision).]  A different ALJ conducted a hearing on the December 2004 application and issued a written decision on October 19, 2005, concluding at step five of the evaluation process that Madrid was disabled as of November 19, 2004 (the day after this ALJ's decision denying benefits).

In the present appeal, Madrid asks the Court to consider whether he is entitled to a closed period of disability from the date of onset, February 8, 2003 until November 19, 2004.  [Doc. No. 14.]

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

3

it "significantly limits his physical or mental ability to do basic work activities . . . .,"[7] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

## Standard of Review

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.

---

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether this Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## Summary of ALJ Decision Denying Benefits

After reviewing Madrid's testimony, medical records, symptoms, and complaints, the ALJ concluded at step five of the sequential evaluation process, without the assistance of a vocational expert's testimony, that the Grids supported a non-disability determination.  [RP 17.]

5

In so deciding, the ALJ made the following specific findings:

(1)  Madrid met the disability insured status requirements of the Act;

(2)  he had not engaged in substantial gainful activity since the alleged onset of disability;

(3)  Madrid had diabetes mellitus, hypertension, Hepatitis C, neuropathy and early diabetic nephropathy which were severe impairments but did not meet a listing, either alone or together;

(4)  his allegations of pain, limitations and inability to work were not substantiated by the evidence and "were not credited";

(5)  Madrid is a 51-year old male with an 11th grade education;

(6)  he had the RFC for light work;

(7)  Madrid's RFC and restrictions precluded him from performing his past relevant work; and

(8)  based on his functional limitations, age, education and work experience, Grid rule 202.10 directed a finding of not disabled.  [RP 17-18.]

Thus, Judge Nail concluded Madrid was not under a "disability" as defined by the SSA from the onset date through the date of that decision, November 18, 2004.  [RP 18.]

## Medical Records

There are very few medical records in this case.  For the most part, Madrid was seen by nurse practitioners at the Mora Valley Health Clinic ("Clinic") in Mora.  The earliest Clinic record indicates that Madrid was seen on October 3, 2000 for an eye exam and that his vision in each eye was 20/200 but 20/100 in both eyes.  [RP 136.]  On December 18, 2002, Mora visited the Clinic for the first of a series of Hepatitis B injections.  [RP 135.]

On January 22, 2003, Madrid received his second Hepatitis B injection.  [RP 134.]  He alleges a disability onset date of February 8, 2003 related to back and foot pain, but there are no supporting

medical records leading up to that date.  It appears that Madrid was fired from his position with the County Waste Department on February 8, 2003, but there are no explanations in the record for his termination.  [RP 44.]

On February 20, 2003, Madrid filed his applications for DIB and SSI benefits.  [RP 38, 178.] He filled out a disability report, showing that he was 5 feet, 9 inches tall and weighed 140 pounds. He alleged that he was limited by back, feet and leg conditions.  Madrid stated he got tired and weak and felt pain.  [RP 43-44.]  He used to work regardless of his pain, but he was fired on February 8, 2003.  In this report, Madrid noted that he had not been seen by a doctor.  [RP 46.]

There is also a "disability report" by the "field office", dated February 20, 2003, indicating that disability services conducted a face-to-face interview with Madrid.  [RP 54.]  The interviewer was asked to answer yes or no regarding whether Madrid had difficulties with hearing, reading, breathing, understanding, concentrating, sitting, standing, walking, using hands, etc.  The interviewer marked "no" for each category with the exception of seeing.  [RP 54.]  The interviewer noted that Madrid wore prescription eyewear and further wrote "blurry vision."  Madrid was observed as "very cooperative" and "older than [his] stated age."  There was no medical evidence before the interviewer.  [RP 55.]

Shortly after filing his applications for disability benefits, Madrid was seen regularly by nurse practitioners at the Clinic.[13]  On February 25, 2003, he visited the Clinic, complaining of leg pain and chest pain radiating to his back.  He also complained of excessive thirst, blurry eyes and numb toes. The records notes that Madrid had had diabetes for 15 years and that he had "pills from then."  He

---

[13]It is unknown whether any physicians worked at the Clinic.  All of the Clinic's medical records in this case appear to be signed by nurses or nurse practitioners.

weighed 131 pounds.  [RP 133.]  On February 27, 2003, Madrid returned for the results of his lab

work which showed he was positive for Hepatitis C.  [RP 139, 140.]  The labs also showed high

glucose (635), high bilirubin, high Alk Phos, high AST, high ALT, high triglycerides, high MCV, high

Hgb A1C and low platelets.  [RP 140, 142.]  Plaintiff's counsel provided the following explanation

for some of the lab results:

> Bilirubin is the pigment in the bile.  The accumulation of bilirubin
> often leads to jaundice. . . . Taber's Cyclopedic Medical Dictionary
> ("Taber's"), at 218 (18th ed. 1997).  ALT (alanine aminotransferase)
> and AST (aspartate aminotransferase) are enzymes present in the
> muscle, liver, and brain.  Increased levels of these enzymes in the
> blood indicates necrosis or disease in these tissues.  Id. at 59, 159.
> Alkaline phospatase is another liver enzyme which is elevated in
> obstructive jaundice.  Id. at 1469.  Increased levels of Hgb A1C
> (hemoglobin A) are associated with uncontrolled blood glucose levels
> in diabetes mellitus.  Id. at 873.  MCV refers to mean corpuscular
> volume.  Id. at 1170.  High MCV is associated with anemia.  Id. at 96.
> Low blood platelet levels may occur in acute infections, anaphylactic
> shock, and certain hemorrhagic disease and anemias.  Id. at 1493.

[Doc. No. 12, p. 2, n. 1.]

On March 6, 2003, Madrid was seen at the Clinic for congestion and the flu.  [RP 131.]

On April 1, 2003, Madrid filled out a Work History Report for disability services.  He stated

he worked as a roofer for over 25 years, including the years 1972-82, 1990-91, 1993-95.  Madrid also

worked with gas and propane from 1996-97, was a cook at Angel Fire Resort from 1997-99, and was

a maintenance worker for the County from 1999-2003.  Madrid stated that during his work, he was

burned by hot tar and exposed to waste toxicants, asbestos and construction dust and debris.  [RP

65.]  He also had been in car accidents.

On the April 1 daily activities questionnaire, Madrid wrote that since his illness, his average

day consisted of working with pain, dryness of mouth, and lack of energy.  His typical meal was from

canned goods, or he ate sandwiches.  He could bathe himself but sometimes felt faint.   Generally, Madrid could care for his personal needs but he felt fatigued.  [RP 72.]

Madrid was able to go shopping and to his doctor's appointments.  He did not need help other than a ride.  While he could drive, he did not have a car.  Madrid stated that he had very little money for medical treatment.  Madrid felt old but did not yet need a walker or wheelchair.  He could walk two blocks "pretty slow."  [RP 66, 72.]

Madrid stated that he tried to do yard work but became tired.  He performed household chores, including dish washing and vacuuming, as he could.  He used to enjoy fishing but it was too much work now.  Madrid walked when he had to, but he tended to stay home and rest.  [RP 68.]  He did not read.  His eyes became red and burned.  Madrid was able to watch television and listen to the radio but mostly he used the TV or radio to distract himself from feeling pain.  [RP 69.]

Madrid did not see his family much because they lived in Denver.  He did not feel he had problems with people.  However, he had no social activities.  Madrid complained of difficulties sleeping and that his legs shook.  He also complained of pain and backaches.  He stated that sometimes he wished he could die because of the pain.  [RP 71.]  He was unable to concentrate because of the pain.  [RP 72.]   Madrid listed his current medications as Glipizide[14] for diabetes, Ibuprofen, Starlix,[15] and Bayer aspirin for back pain.  He was also taking Doxycycline (antibiotic for bacterial infections) and a medication for his nasal congestion.  [RP 71.]

---

[14]"Glipizide is an anti-diabetic drug (sulfonylurea-type) used along with a proper diet and exercise program to control high blood sugar. It is used in patients with type 2 diabetes (non-insulin-dependent diabetes). It works by stimulating the release of your body's natural insulin."  www.webmd.com

[15]Starlix or "Nateglinide is used, either alone or in combination with metformin, to treat type-2 (non-insulin dependent) diabetes. It lowers blood glucose levels by increasing the amount of insulin released by the pancreas."  www.webmd.com

Madrid noted he had a prior arrest record for theft, forgery and DWI.  [RP 72.]

Madrid also filled out a Pain Report.  Most of the pain he describes as his first, second and third worst pain sound similar.  For example, he stated that his "first pain" was the top of his head to the tips of his toes, front and back.  He felt stabbing, aching, stinging, cramping, throbbing pain often during the day or continuously.  It lasted all day and night when he tried to sleep.  [RP 76-77.]  The pain had increased over time.  He was losing weight.  Eating and sitting helped the pain.  He used over the counter medications, hot and cold alcohol rubs and hot baths to help.  The "second pain" he listed was: "mostly low back and under rib cage, knees and ankles and feet, shoulder joints and head" all day and all night.  [RP 79.]  He took over the counter medication or whatever he could afford.  [RP 80.]  Madrid had a prescription for Darvocet (pain medication) but had no money to fill it.  His "third pain" was described as being in his head, shoulders, back, low back, legs and feet.  He also felt weakness.  The pain was continuous.  His diabetes was worsening every day.  "Stress and poverty" made his conditions feel worse.  [RP 81.]  Madrid wrote on the form that his complaints of pain sounded repetitive but he knew his body was not the same as it was when he was 35 years old and younger.  His body now ached all over.

On April 3, 2003, Madrid was seen at the Clinic, complaining of itchy legs and a rash.  He weighed 130 pounds.  The health care provider noted that they might need to start him on insulin.  On April 10, he was again seen at the clinic.  His average blood sugar levels were in the 200's or 200-250.  His weight was unchanged.  The Clinic providers were considering whether Madrid's second diabetes medication should be increased.  The record notes "myalgia."  [RP 129.]

On April 17, 2003, Madrid visited the Clinic complaining of lower leg pain.  He was taking Bayer and Darvocet for pain.  The record indicates "walking a lot; watching diet."  He was given

10

Amitryptyline (an anti-depressant sometimes used for help with sleep problems and other problems) for insomnia.  [RP 128.]

On April 24, 2003, Madrid was given a prescription refill for Darvocet.  He weighed 142 pounds.  [RP 127.]  On May 7, 2003, Madrid complained of fatigue, backaches, foot pain, headaches, numbness in his feet.  He had multiple scrapes to his legs and a bump on the bottom of his foot.  He requested refills on the Ibuprofen and Darvocet medications.  Madrid also had lesions noted on both legs.  The diagnoses were Diabetes Mellitus II ("DM"), neuropathy, and a nodule on right foot.  [RP 125.]  The health care provider, Nurse Practitioner Montano, discussed smoking cessation with Madrid, and he said he "would think about it."  Montano scheduled some instruction for Madrid to learn how to give himself Insulin injections.  She also increased the Amitryptyline for Madrid's neuropathy.

On May 13, 2003, Madrid complained of increased thirst and insomnia.  He was eating foods high in carbohydrates.  He was counseled about his meals and caloric intake.  He was to return the next day for his Insulin injection and further counseling.  Madrid was advised to exercise and avoid "over-indulgence" with fruits and starches.  [RP 124.]

On May 14, 2003, Madrid began receiving Lantus[16] insulin injections.  [RP 124.]  There is a medical record, dated May 20, 2003, noting that Mora had left his insulin supply in Denver, Colorado while traveling.  [RP 124.]  On May 27, 2003, Madrid was seen at the Clinic.  He weighed 144 pounds and was counseled on the effects of his medications.  [RP 122.]

---

[16]Lantus SubQ is used to treat the following:  Type 2 Diabetes Mellitus, Type 1 Diabetes Mellitus, High Blood Sugar.  www.webmd.com

11

On June 4, 2003, Madrid complained of leg pain and having had heartburn "for a very long time."  His glucose was recorded as being under better control, but "not perfect."  [RP 121.]

On July 10, 2003, Madrid's initial disability application was denied.  The July 10 Disability Services letter to Madrid explained that the agency had reviewed a Mora Valley Health Clinic report,[17] received on April 25, 2003.  [RP 22.]  The Agency stated that the medical evidence showed Madrid was diabetic, and that the condition required regular medical follow-up, attention to diet and exercise.  "It would appear that you are doing well with all of these things."  In addition, the Agency letter noted that while records indicated that Madrid tended to get depressed from time to time, there was "no indication of any serious mental illness."  [RP 22.]

Also on July 10, 2003, Madrid was seen at the Clinic, complaining of dizziness, chest pain, lower back pain and right arm muscle pain.  He was given Vioxx.[18]  Madrid's EKG results appeared normal.  [RP 117, 137.]  On July 16, 2003, Madrid was given a re-fill on his prescription of Ibuprofen 800.  On July 23, Madrid complained of pain in his back and feet and requested pain medication.  The record notes that Madrid's diabetes was uncontrolled.  He was counseled regarding proper diet and medication management.  Naproxen[19] was prescribed for pain.  Madrid was also counseled on smoking cessation.  [RP 115.]

---

[17]It is not clear what report this was, since none of the medical records contain a date of April 25, 2003, although perhaps an earlier medical record was received on this date.

[18]"This medication is a nonsteroidal anti-inflammatory drug (NSAID), specifically a COX-2 inhibitor, which relieves pain and swelling (inflammation). It is used to treat arthritis, acute pain, acute migraine attacks . . . ."  www.webmd.com

[19]"Naproxen is a nonsteroidal anti-inflammatory drug (NSAID), which relieves pain and swelling (inflammation). It is used to treat headaches, muscle aches, backaches, tendonitis, bursitis, dental pain, menstrual cramps, arthritis, or gout. This medication is also used to reduce fever and to relieve minor aches and pain due to the common cold or flu."  www.webmd.com

In a reconsideration disability report, Madrid noted more pain in his low back, chest, legs and feet. He was not walking as much and not sleeping as well. [RP 84.] The form also states that "Doctor Bunker"[20] had placed him on limitations, that he could not work, that he suffered from dizziness and weakness in his legs.

On July 31, 2003, Madrid filed a request for reconsideration of the denial of his underlying benefits application. He stated he had diabetes, and liver and back pain. [RP 27.] On July 31, Madrid was seen at the Clinic, complaining of arthritic pain throughout his body. [RP 113.] The record appears to note that Madrid did not have any ulcerations or sores on his feet, nor inflammation at the insulin injection sites. [RP 113.] He was given a prescription for Tylenol #3 (usually contains codeine) for pain but was counseled to use it sparingly. The health care provider discussed with Madrid possible liver impairment with chronic use of the medication. Madrid was unable to afford the "cox 2 inhibitors." [RP 113.]

The Clinic record, dated August 6, 2003, notes under "chief complaint": "Diabetic re-check, motor vehicle medical report." [RP 114.] Madrid had eaten a meal high in carbohydrates the night before. Otherwise, he apparently was following his blood sugars properly and "maintaining good control." [RP 114.] On August 13, 2003, Madrid complained of pain in his legs that kept him up at night. The record notes uncontrolled DM and neuropathy. The Nurse Practitioner was increasing Madrid's evening Insulin injection. Madrid was also prescribed Neurontin.[21] [RP 111.]

On his daily activities questionnaire, dated August 14, 2003, Madrid stated that he began the day by taking insulin and checking his blood sugar levels. He could not exercise because of chronic

---

[20]Another record indicates that Mary Bunker was a certified nurse practitioner. [RP 102.]

[21]Neurontin or "Gabapentin may . . . be used to treat other nerve pain conditions (e.g., diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia)."   www.webmd.com

pain in his leg, back and neck.  He was unable to do many activities because of pain and tiredness.
Madrid did not run errands but was able to take a short walk to the store or to walk up and down the
yard.  He washed dishes and clothes.  He needed assistance from others in terms of rides to medical
appointments or to the store.  Madrid was not using a walker, cane or wheelchair because he could
not afford them.  He ate what he had around the house, mainly canned goods.  Madrid ate in the
morning and evening.  Sometimes his girlfriend or someone else helped him with cleaning.  Typically,
Madrid stayed home.  He had no interests or hobbies.  He watched television or listened to the radio
for 6-8 hours a day but mainly to create noise or for distraction.  Madrid complained he had trouble
sleeping because of neuropathy and chronic pain.  In order to deal with the pain, Madrid stayed up,
gave himself rubs or walked around the room.  He felt depressed because he could not function
properly.  However, he was able to take care of his personal needs.  [RP 90-92.]

On September 8, 2003, Madrid was seen at the Clinic for a follow-up appointment.  The
record notes uncontrolled DM and smoking.  He was again counseled on smoking cessation.  [RP
110.]

On September 24, 2003, disability services physician, Rayme Romanik reviewed Madrid's
records.  She stated that Madrid alleged disability due to his "back, legs, and feet," and that he was
unable to work because of tiredness and pain.  [RP 146.]  Dr. Romanik noted that Madrid also stated
that he worked despite the pain until he was fired on February 8, 2003 "for unclear reasons."  Clinical
exams and laboratory evidence supported the diagnosis of poorly controlled DM, but Dr. Romanik
noted that "technically [Madrid] has not been seen by an 'acceptable medical source'."  Dr. Romanik
further wrote that despite his complaints of pain, Madrid stated he walked a lot (in a April 17, 2003
medical record) and that no limitations were noted for sitting, standing or walking during a disability

14

services field office interview in February 2003.  Clinical exams indicated good circulation and lack of skin changes, including no ulcers.  There was no actual neurological evaluation "despite an apparent presumptive diagnosis of a neuropathy due to the prescription of Neurontin."  Dr. Romanik concluded that "[r]egardless, the claimant does not appear to be functionally limited despite his complaints of pain.  The claimant is also noted to be Hepatitis C+ as of 2/27/03 and did have some elevation in his liver enzymes and a Bilirubin of 1.7.  However, again, he is not significantly functionally limited."  [RP 146.]

Dr. Romanik also wrote that Madrid's "MDI is poorly controlled DM."  She concluded, based on a review of the records, that most of Madrid's complaints could be explained based on his poor control of his diabetes and that he would improve with better compliance.  She also stated that "he may have peripheral neuropathy but that has not been clearly documented."  Dr. Romanik determined that Madrid was not very limited functionally and that his condition was "felt to be" not severe.  [RP 146.] Dr. Romanik did not fill out any other type of limitation assessment, and her written evaluation consists of two short paragraphs.

On September 24, 2003, Madrid saw Dr. Paul Kovnat, of Internal Medicine and Nephrology, in Santa Fe.  Dr. Kovnat wrote a letter to the Nurse Practitioner at the Clinic who had referred Madrid.  He stated that Madrid had a 15-year history of diabetes, known history of alcoholism in the past, hepatitis C positive, and that he is "doing fairly."  [RP 169.]  It is not clear whether Dr. Kovnat meant Madrid was doing fair or whether he intended to write he was doing fairly well.  Dr. Kovnat stated that Madrid knew about the necrobiosis[22] on his legs and his chronic back pain.  Dr. Kovnat's

---

[22]"Necrobiosis lipoidica diabeticorum (NLD) is thought to be caused by changes in the collagen and fat content underneath the skin. The overlaying skin area becomes thinned and reddened. Most lesions are found on the lower parts of the legs and can ulcerate if subjected to trauma. Lesion have fairly well defined borders between

first recommendations were to discontinue the non-steroidals, Vioxx, Bextra, Naprosyn and to discontinue smoking totally.  He considered these to be the first most important ways to address Madrid's problems.  He recommended that Madrid be started on an "ACE inhibitor such as Enalapril[23] to protect the kidneys in view of his diabetes."  Dr. Kovnat recommended that Madrid follow-up closely with the Nurse Practitioner and that lab work be done.  Dr. Kovnat closed by stating that "[t]his man with early diabetic nephropathy[24] needs close follow-up."  [RP 169.]  It does not appear that Dr. Kovnat saw Madrid again.

In September 2003, Madrid's request for reconsideration of an earlier denial of benefits again was denied.  Disability services had reviewed a report from the Clinic received on September 20, 2003.  [RP 21, 29, 100, 183.]

On November 4, 2003, Madrid filed a request for a hearing before an ALJ, alleging that he was not able to work "due to insulin shots, Hepatitis C, liver infection, tiredness, fatigue, peripheral neuropathy, chronic pain, back and kidney and liver pain and roofing and accidents in my past."  [RP 33.]  At this point, Madrid was still acting *pro se*.  In a form statement, Madrid wrote that he had blood in the kidneys and borderline high blood pressure.  He was not able to walk as much and suffered from more pain to the liver, kidneys, legs, back and feet.  Madrid also stated he had been seen by Dr. Kovnat in September and November 2003, but there is only one letter from Dr. Kovnat,

---

normal skin and affected lesions.  Sometimes, NLD is itchy and painful."  www.webmd.com

[23]This medication is used to treat high blood pressure (hypertension).  www.webmd.com

[24]"Diabetic nephropathy is a complication of diabetes that is caused by uncontrolled high blood sugar. High blood sugar damages the filtering system of the kidneys. . . . Over time, the damage can lead to kidney failure. Diabetic nephropathy is the most common cause of kidney failure in the United States."  www.webmd.com

as summarized above.  [RP 101.]  Madrid wrote that he had seen Dr. Kovnat for "chronic renal impairment, DM type II."

On January 7, 2004, Madrid was again seen at the Clinic.  He stated that Lorazepam[25] was the only medicine that helped his leg pain.  He was unable to follow up with Dr. Kovnat because he could not afford the medical care.  The record, filled out by Nurse Practitioner Montano, states that Madrid continued to drink alcohol "due to the leg pain."  Madrid had obtained legal aid to try to get Medicaid.  He was taking his insulin sporadically, and not monitoring his blood sugars or diet.  He weighed 158 pounds then.  He had minimal sensation at the bottom of his feet.  His DM II was uncontrolled and the record notes ETOH (alcohol) abuse.  Montano encouraged Madrid to monitor his blood sugars and take his Insulin as prescribed.  She also discussed alcohol cessation with Madrid but he was not ready to stop drinking or smoking.  [RP 151.]

On January 22, 2004, Madrid was seen at the Clinic.  He had some "scabbed lesions" but no feet ulcerations.  The note indicates that the Clinic provider had spoken to Dr. Kovnat who advised the clinic to collect a renal panel.  [RP 152-53.]  On February 4, Madrid was seen for a follow-up appointment at the Clinic.  He had an irregular heart beat but denied feeling it.  There were no lesions on his feet.  An EKG was abnormal.  [RP 165.]  The note indicates Madrid's DM II was uncontrolled.  He had an appointment with a cardiologist on February 10 and an appointment with Dr. Kovnat on February 24.  [RP 154.]  It does not appear that Madrid went to either appointment. There are no corresponding medical records.

---

[25] 'Lorazepam is used to treat anxiety. . . . This drug may also be used for seizures, alcohol withdrawal, prevention of nausea and vomiting due to chemotherapy, tension headache, and for sleeping trouble (insomnia)." www.webmd.com

On March 26, 2004, Madrid appeared to have his lab work done in preparation for his appointment with Dr. Kovnat. The lab results showed the his "AST" as high, "ALT" as high, "MCV" as high, platelets as low, and Hbg A1C as high. [RP 155, 155, 160, 162.]

On June 10, 2004, Madrid was seen at the Clinic. He complained that his lower back hurt, increased bruising and that his eyes appeared yellow. He did not present with any lesions or rashes. His blood pressure was 152/90. Under the Nurse Practitioner's "Assessment", she wrote "DM type II uncontrolled, HTN uncontrolled, renal failure, ___ (illegible) acute prostatitis, tobacco use/ETOH abuse, noncompliant." [RP 157.] She listed a number of medications Madrid was taking but not all are legible on the record.

On June 24, Madrid weighed 132 pounds. His blood pressure was controlled. The nurse practitioner's assessment was DM type II, HTN (controlled), CRF ("chronic renal failure"), Hepatitis C, ETOH abuse. The provider attempted to reinforce importance of compliance with medications and also discussed smoking and alcohol cessation with Madrid. [RP 158.]

On July 26, 2004, the Clinic record indicates Madrid skipped his morning dose of blood pressure medication. His blood pressure was 148/96. He weighed 125 pounds. He was not taking his Lantus injections timely. The record notes something about liver and again chronic renal failure. Under assessment, the nurse practitioner wrote hepatitis C and "thrombocytopenic". [RP 159.] She also wrote that she again reinforced importance of compliance to Madrid but stated that "patient currently refusing GI referral for liver evaluation."

On August 2, 2004, Nurse Practitioner Montano wrote a letter, addressed "to whom it may concern." She states that Madrid had been a Clinic patient for the last year. They discovered he was disabled because he was in end state renal failure as well as being diagnosed with Hepatitis C, a

18

disease that could lead to liver cancer. The letter also states that Madrid had insulin dependent diabetes, nephropathy resulting in end stage renal failure, and neuropathy. [RP 150.]

On August 4, 2004, another Nurse Practitioner, Geri Vigil, of the Clinic also wrote a letter on behalf of Madrid. She stated that the Clinic had been his primary care provider for one year and that she had observed Madrid's health decline over that time. He suffered from multiple conditions, including DM II (insulin dependent), Hepatitis C, endstage liver/kidney disease and hypertension. Ms. Vigil also wrote that Madrid had to travel to Santa Fe to see Dr. Kovnat (nephrologist) for specialty care regarding his kidney impairments. Vigil believed Madrid was eligible for disability benefits. [RP 172.]

On August 6, 2004, the ALJ hearing was conducted in Santa Fe. Madrid was represented by counsel, although his attorney had only started representing Madrid in January 2004. [RP 9.] Madrid testified that he could see all right with prescription glasses. He used a cane because he became dizzy and it was sometimes difficult to walk up and down stairs. [RP 192-93.] After he was fired from the waste department in February 2003, Madrid did not look for other work because he was "pretty sick," his blood sugar levels were uncontrollable, and he suffered from dizziness. [RP 194.] Madrid testified that he was 5 foot 9 inches and weighed 125 pounds that day, while his regular weight had been 165. He said that he had DM, kidney disease or a kidney dysfunction according to the doctors, Hepatitis C, high blood pressure and some problem with his eyes. [RP 195-96.] He was not on dialysis and had not had a liver biopsy. Madrid stated that he took all of his medications daily and did not suffer any side effects. [RP 197.]

Madrid testified that he had been seen by Dr. "Katina" in Santa Fe three to four times so far. [RP 196-97.] It appears that Madrid saw a Dr. Thomas Kravitz, but none of those medical records

are a part of this administrative record.  Medical records documenting Dr. Kravitz's treatment of

Madrid apparently supported Madrid's second application for benefits that was granted.  *See* October

19, 2005 ALJ opinion, at p. 4, attached to Plaintiff's reply.

Madrid had a driver's license but did not drive much since he did not own a car.  He had

visited his family in Denver within the last five to six months, but traveled by bus.  [RP 198.]  Madrid

testified that he spent time at a senior citizen's center during the day and played some card games

there.  [RP 199.]  He did not attend church.  He "very occasionally" went out to eat.  Madrid liked

to watch football on television, but he was unable to read because his eyes became tired.  [RP 200.]

Madrid used to enjoy fishing and hunting but was too tired to engage in those activities now.  His

only other hobby was drawing.  He tried to do household chores as much as he could.  He was able

to do his own laundry, but his sister accompanied him shopping.  Sometimes a friend came by and

picked him to go to the senior citizen center where he might stay an hour.  [RP 202.]

Madrid tried to do a little exercise and walk, so that he could avoid getting bed sores.

However, he felt better when lying down and tended to spend a fair amount of time lying down.  [RP

203.]  Madrid often was unable to sleep because of pain.  He took baths but not showers because he

was afraid of falling.  [RP 204.]  He could bathe and dress himself.  His appetite was pretty fair but

he could not gain any weight.  Madrid testified that he could sit for an hour or two, but he had to rub

his legs constantly because of pain.  He might be able to stand for 60 to 90 minutes.  He could walk

a block, and might be able to lift a gallon of water.  Madrid could not kneel, could not bend much but

could squat with the help of a cane.  [RP 205.]  He complained of pain in the joints of his hands.

Madrid testified that he smoked "very occasionally," perhaps five cigarettes a day, and that

he did not drink.  He did not use recreational drugs.  [RP 206.]  In response to his attorney's

questions, Madrid said he took Insulin shots five times a day.  His blood sugars tended to be in the 200's and sometimes as high as 300.  [RP 207.]  He felt dizzy often.  When asked about his kidneys, Madrid stated that he had low back pain, had found blood in his urine and presumed it was an infection.  [RP 208.]  Madrid said he had blurry vision, that his legs had sores on them and that he had bad circulation.

At this point, the ALJ asked Madrid a few more questions about his drinking.  Madrid stated that he had stopped drinking five years ago.  [RP 210.]  The ALJ confronted him with the January 2004 medical record that indicated Madrid was still drinking as of that date.  Madrid responded "oh really?"  [RP 210.]  The ALJ pointed out that the medical reports continue to show Madrid was using alcohol.  Madrid then responded that he did drink but "not like he used to drink."  Madrid gave contradictory testimony about drinking during the hearing, stating he did but did not drink, that he drank but did not abuse alcohol.  [RP 211-12.]  Clearly, Madrid was still drinking, as is confirmed by the medical reports and Madrid's own inconsistent testimony.  The ALJ asked Madrid how he contracted Hepatitis C and whether it was through IV drug use.  Madrid admitted that it might have been through IV drug use when he was in his early 20's.  [RP 214.]

There was no vocational expert testimony at the hearing.  On November 18, 2004, ALJ Nail issued his adverse decision on Madrid's benefit application.  In so finding, Nail considered, *inter alia*, Madrid's non-compliance, continued drinking and smoking, lack of credibility, disbelief that Madrid was in end state renal failure, and the opinions of state medical consultants.  [RP 14.]

On December 3, 2004, Madrid filed a request for review, along with a letter from his attorney.  [RP 10, 173.]  The Appeals Council rejected Madrid's request, after considering his attorney's letter.  [RP 5, 8.]  As stated previously, Madrid was granted benefits related to a subsequent (December 29,

21

2004) application, and now seeks benefits for a closed period of disability, from February 8, 2003 to November 19, 2004.

**Discussion**

Madrid challenges the ALJ's RFC finding that he could perform light work and argues it is unsupported by substantial evidence and legally erroneous.  More specifically, he asserts that the ALJ failed to obtain a RFC assessment from any physician, failed to adequately develop the record and erred in conclusively applying the grids because Madrid suffers from non-exertional impairments as well as exertional limitations.  Madrid also argues that the ALJ's credibility determination is unsupported by substantial evidence and legally erroneous.

The Commissioner asserts that the ALJ's decision should be upheld because it is supported by substantial evidence and not legally erroneous.  The Commissioner argues, *inter alia*, that Tenth Circuit case law does not require a residual functional capacity assessment from a physician, unless the ALJ's duty to further develop the record is triggered.  Essentially, it is Defendant's position that no duty to further develop the record in this case was triggered.

## I.    STEP FIVE FINDINGS

ALJ Nail reached his non-disability determination at step five of the sequential process.  At step five, the Secretary has the burden of showing that Madrid is able to perform other substantial gainful activity considering his age, education and prior work experience.  Upon reaching the fifth step of the evaluative process, the grids may be used to determine whether a disability exists.  Gathright v. Shalala, 872 F. Supp. 893, 897 (D.N.M. 1993) (*citing* 20 C.F.R. Part 404, Subpt. P, App. 2)).  To apply the grids, the ALJ must make findings regarding the applicant's age, education, work experience and RFC.  Id.  Application of the "grids assume[s] that the claimant's sole limitation

is lack of strength, i.e., an exertional impairment." Id.  However, when a claimant presents evidence of both exertional and nonexertional impairments (such as pain, diminished vision), the grids can only be used as a framework for making the disability determination.  In addition, the ALJ must then make findings on how much a claimant's work ability is further diminished by any nonexertional restrictions. Id. at 897-98.  If a claimant's nonexertional limitations are significant enough to reduce further his work capacity, the ALJ must give "full consideration to all relevant facts, including vocational expert testimony if necessary, in determining whether the claimant is disabled." Id. at 898 (internal citation omitted).

Here, Judge Nail noted that Madrid was a 51-year old male with an 11th grade education. He further discussed Madrid's past work experience.  He then determined, "based on the record before [him]" that Madrid had the RFC to perform light work.  In support of the ALJ's determination, Judge Nail noted that the state agency medical examiner opined that Madrid's impairment might improve with better compliance and that Madrid's impairments were not severe. Dr. Romanik, the consulting physician, concluded that Madrid was "functionally not very limited." [RP 164.] It is noteworthy that neither Dr. Romanik nor any other physician performed a physical RFC.

Dr. Romanik also indicated that "technically" (because Madrid was seen only by Nurse Practitioners as of that date), he had not been seen by an "acceptable medical source."  Madrid had not been seen frequently by any medical care provider before February 2003, although it appears that Dr. Romanik reviewed those few medical records in writing her brief two-paragraph evaluation.  Dr. Romanik's determination was buttressed, in part, by one medical record (4/17/03), at which time Madrid admitted to "walking a lot," and to a FO "Field Office" interview in February 2003 when a

disability services interviewer observed Madrid as having no physical limitations, other than some seeing problems.

Judge Nail, in reaching his ultimate findings, noted that while Madrid opined that he was in "end stage renal failure due to diabetes and Hepatitis C," that determination was made by a nurse practitioner, without any supporting medical records [or corroborating test results].  [RP 15.]  The ALJ also stated that is was no persuaded by the opinions of a certified nurse practitioner that [Madrid] is in end stage renal failure" and further that his internist did not find that [Madrid] was disabled."  Like Dr. Romanik, Judge Nail apparently relied on one medical record to conclude that Madrid "does a great deal of walking."

## II.   FAILURE TO REQUIRE RFC ASSESSMENT/TO FURTHER DEVELOP RECORD

The Court is troubled by the consultative physician's failure to perform an RFC Assessment in this case, the agency's failure to order a consultative exam, and/or the agency's failure to re-contact the treating physicians or medical care providers for additional information in this case.

The Commissioner relies on Howard v. Barnhart, 379 F.3d 945 (10th Cir. 2004), in support of its position that the Tenth Circuit does not require that an RFC Assessment from a physician.  In Howard, however, there was evidence in the form of a consultative exam to support the ALJ's RFC assessment.  Id. at 948.  That is not the case here.  There was neither a consultative exam, nor an RFC assessment by a physician.  Indeed, this is a case involving a claimant who apparently did not have sufficient funds to obtain specialized and/or comprehensive medical care for his conditions, and who may have sought medical care from an agency that does not employ physicians on a regular basis; thus, his treatment by nurse practitioners.

The Court agrees with the proposition that the "agency's burden at step five does not include the burden to provide medical evidence in support of an RFC assessment, unless the ALJ's duty to further develop the record is triggered."  Id.  Here, however, the Court concludes that the ALJ's duty to further develop the record was triggered.

This Court recognizes that the Secretary "has broad latitude in ordering consultative examinations."  Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  In Hawkins, the Tenth Circuit advised:

> it is clear, where there is a direct conflict in the medical evidence requiring resolution, . . . or where the medical evidence in the record in inconclusive . . ., a consultative examination is often required for proper resolution of a disability claim.  Similarly, where additional tests are required to explain a diagnosis already contained in the record, resort to a consultative examination may be necessary.

Id. at 1166 (internal citations omitted).  The Tenth Circuit observed a number of agency regulations that clarified when consultative examinations should be ordered, i.e., if the information the agency needs is not readily available from the records of your medical treatment source, if the agency is unable to seek clarification from your medical source, if the existing information is ambiguous, or if the existing medical evidence does not contain clinical findings and laboratory tests necessary for a decision.  Id. at 1166-67 (internal citations omitted).

The Tenth Circuit recognized that it was difficult to determine whether to order a consultative exam in situations where there is "*some* evidence in the record or *some* allegation by a claimant of a possibly disabling condition, but that evidence, by itself, is less than compelling."  Id. at 1167.  The Court concluded that "the starting place [for making such determination] must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  Id.

25

Here, Madrid provided objective evidence in the record that he had diagnoses, including uncontrolled DM II, Hepatitis C, early diabetic nephropathy requiring close follow-up, and hypertension, that could have caused the fatigue and pain he complained of during a number of visits to the Clinic.  Lab results from February 2003 and March 2004 reflected abnormalities in a number of areas, including liver function.   Madrid had insulin dependent DM II and was prescribed medications for pain, including Darvocet, Naproxen and Lorazepam, medication for liver problems, medications to protect his kidneys and medication for neuropathy.  This was sufficient objective evidence that could have materially impacted the ALJ's disability decision, requiring further investigation.

Moreover, while the ALJ rejected the nurse practitioner's diagnoses of end stage renal failure, because that diagnosis was unconfirmed by medical testing and/or because it was the opinion of a nurse practitioner rather than a doctor, there is evidence that two different nurse practitioners concluded that Madrid was in end stage renal failure.  [RP 150, 157, 159, 172.]  In addition, the specialist, Dr. Kovnat advised the Clinic to collect a renal panel for Madrid, although it is not clear that the panel was collected.  In addition, the ALJ could observe at the hearing that Madrid, at a current weight of 125 pounds, had lost as much as 30 pounds since the January 2004 medical record.

In addition, the Court concludes that Dr. Romanik's cursory written evaluation and conclusion are  not substantial evidence to support the ALJ's non-disability decision, particularly when her report relies on the observations of a non-medical specialist, i.e., the agency field officer or interviewer, for determinations of Madrid's physical limitations.

The Court finds that under the circumstances presented by this case, the ALJ's duty to order a consultative exam, require a RFC assessment by a physician, and/or re-contact treating healthcare

providers, like Dr. Kovnat, was triggered.  In addition, the ALJ's comment that Dr. Kovnat did not

find Madrid to be disabled is not substantially supported.  The single letter from Dr. Kovnat makes

no reference as to whether Madrid was or was not disabled, nor was Dr. Kovnat asked to provide

such an opinion.  Finally, there was inconclusive evidence concerning Madrid's capability of lifting

a certain amount of weight, and his capabilities of standing and sitting for prolonged periods of time.

In sum, the Court determines that a remand to further develop the record is appropriate.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Remand for a Rehearing [Doc.

No. 11] is GRANTED and the case is REMANDED so that the ALJ can address the issues discussed

herein.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge